**Donna R. CALLAHAN, Plaintiff,**

v.

**Jo Anne B. BARNHART,
Commissioner of Social
Security,[1] Defendant.**

**No. Civ.A.8:00–CV–1005–T.**

United States District Court,
M.D. Florida.

Jan. 30, 2002.

---

1. Kenneth S. Apfel was the original defendant in this action. On January 20, 2001, he was succeeded by William A. Halter. On March 29, 2001, Larry G. Massanari was designated Acting Commissioner of Social Security. On November 14, 2001, Jo Anne B. Barnhart was confirmed as Commissioner of Social Security. The named defendant in this action has changed accordingly. Fed.R.Civ.P. 25(d)(1) ("When a public officer is a party to an action in his official capacity and during its pendency ... ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

George C. Psetas, Port Richey, FL, for plaintiff.

Susan Roark Waldron, Assist. U.S. Atty., Tampa, FL, for defendant.

## MEMORANDUM AND ORDER

YOUNG, District Judge.[2]

This is an action under section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2. Of the District of Massachusetts, sitting by designation.

The plaintiff, Donna Callahan ("Callahan"), seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Social Security Disability benefits.

## I. BACKGROUND

### A. Statement of Facts

### 1. Medical History

On September 3, 1984, Callahan (then named Falk) was involved in a motorcycle accident in which she sustained compound fractures to the radius and ulna of her left arm and fourth and fifth metacarpals of her left hand, lacerations on her left knee, and multiple contusions and abrasions. Tr. 168. Callahan was taken to the University Community Hospital in Tampa, Florida, where her lacerations were closed, her left arm was placed in a splint and the metacarpal fractures in her left hand were treated with an intermedullary pin fixation. *Id.* A week later metal plates and screws were attached to her left radius and ulna. *Id.* On September 20, Callahan was transferred to the care of Dr. William L. Earp, who supervised her recovery and continued to see her until May 10, 1998. Tr. 160–68. On October 4, Dr. Earp removed the pins from the metacarpals and placed Callahan in an extended, short-arm cast that extended out over the three fingers that sustained fractures. Tr. 168.

On January 11, 1985, Dr. Earp reported that all of Callahan's fractures had healed. Tr. 167. Dr. Earp told Callahan that she no longer needed the cast, and that she should engage in as much exercise and activity as possible, except for lifting objects weighing in excess of fifty pounds, climbing or using heavy tools (like hammers). *Id.* On April 10, Dr. Earp removed the metal plates and screws from Callahan's forearm. Tr. 166. Dr. Earp observed in May, however, that the radius of Callahan's left arm had not completely healed. *Id.* Dr. Earp therefore performed a bone graft operation on May 15. Tr. 165. On May 23, Dr. Earp placed Callahan in a splint, followed by a long-arm cast. *Id.* Dr. Earp placed her in a short-arm cast on July 11, *id.*, but after complaints from Callahan about increased discomfort, Dr. Earp restored her to a long-arm cast on July 19, *id.* On August 9, Callahan indicated to Dr. Earp that she had not been able to find a job, because nobody seemed to want to hire her, and her previous experience—as a typist and cosmetologist—was useless with her arm in a cast. Tr. 164. Dr. Earp suggested that Callahan obtain additional education. *Id.* On November 13, Dr. Earp reported that Callahan's arm revealed "excellent healing ... with better functioning ability in the arm than we might have anticipated considering all the injury and surgery." *Id.* Callahan displayed full range of elbow flexion, extension, pronation, and supination, good wrist function, slight restriction of full flexion and extension, and good strength in her hands. Tr. 163. Dr. Earp told Callahan she could engage in "most activities that she would care to," unless she developed pain symptoms around a pin in her wrist, in which case the pin would be removed. *Id.* Dr. Earp otherwise released Callahan from active care.

On March 6, 1987, Callahan was involved in a rear-end vehicular accident. *Id.* She was diagnosed at the time of the accident with a neck or back sprain, and was advised to seek an orthopedic follow-up examination. *Id.* Shortly after the accident Callahan went to the First Help Clinic for an orthopedic consultation, where she was placed on a regimen of physical therapy and given Motrin and Tylenol. *Id.* About six weeks after the second accident, Callahan also began seeing a neurosurgeon, a Dr. Taxdal, who opined that Callahan had flexion extension injury. *Id.* Dr. Taxdal also recommended physical therapy, and prescribed Darvocet and a TENS Unit. *Id.*

After seeing Callahan for two months, Dr. Taxdal concluded that Callahan had no neurosurgical problem, and that her condition was instead attributable to the strains of her work supervising children in a nursery and housework. Tr. 162–63.

On July 22, 1987, Callahan returned to see Dr. Earp, who reviewed the reports of the First Help Clinic and Dr. Taxdal. *Id.* Dr. Earp noted at that time that both physical examination and x-rays were normal, that Callahan had about ninety percent of normal range of motion, and that scapular motions were full and equal. Tr. 162. Dr. Earp concluded that Callahan "has not sustained any permanent injury and she will fully recover in time." *Id.* Dr. Earp recommended that Callahan continue her regimen of over-the-counter medication and at-home physical therapy. *Id.*

On March 16, 1988, Dr. Earp reviewed past and present x-ray films of Callahan's back and neck, and found no real change. He did note, however, that Callahan had gained weight. Tr. 160–61. Dr. Earp opined that Callahan "probably with her injury had increased discomfort, gave into the pain, decreased her activities and started gaining weight." Tr. 160. Dr. Earp encouraged Callahan to stick to her exercise program, and recommended that she take Motrin 800 no more than three times per day for pain or discomfort associated with her injuries or her exercise regime. *Id.* On May 10, 1988, Dr. Earp's final medical report indicated that Callahan continued to have problems with neck and back pain, and thought that Callahan ought continue her weight reduction program, taking pain medication as needed. *Id.*

Callahan apparently did not seek further medical treatment until January 1994, when she checked into an emergency room complaining of chest pain. Tr. 179. All tests and examinations came back normal, although she was prescribed Tagamet and Carafate, and told to see another doctor as soon as possible. *Id.* On January 21, 1994, Callahan began seeing Dr. Troy R. Jones, who served as her doctor until April 10, 1996. Tr. 169–81. Dr. Jones's preliminary examination of Callahan assessed her as an overweight but healthy patient. Tr. 180. He prescribed a daily dose of Aspirin and Nitrostat, and set up a follow-up appointment for the next week. *Id.* During the follow-up appointment, Dr. Jones found a small-to-moderate sized hiatal hernia with gastroesophageal reflux, but noted that there was neither any persistent deformity nor definite ulcer. Tr. 178. During a checkup one month later, Dr. Jones noted that Callahan still had symptoms of reflux esophagitis, and had gained weight since her last visit. Tr. 175. Dr. Jones restricted Callahan to a diet of 1200 calories per day, and recommended that she avoid coffee, tea, tobacco, black pepper, alcohol, and any other food products that might aggravate her situation. *Id.*

On June 6, 1994, Dr. Jones saw Callahan to check on her acid reflux. Tr. 174. At that time, he noted that Callahan was still overweight, but had her reflux under control. *Id.* He suggested dietary counseling in response to her request for an appetite suppressant. *Id.* On November 11, 1994, Dr. Jones saw Callahan for heel and foot pain which, after an x-ray, he diagnosed as a heel spur and treated with a non-steroidal, anti-inflammatory injection. Tr. 173, 181. On December 7, 1995, Callahan complained of headaches, nausea, vomiting, diarrhea, and "hemorrhaging under the eyes." Tr. 171. Dr. Jones diagnosed Callahan with sinusitis and prescribed Amoxicillin for ten days, Tylenol for fever, and a no-salt diet. Tr. 172. On December 11, 1995, Dr. Jones saw Callahan for high blood pressure. He instructed her to cut down on her salt intake, but ruled out hypertension. Tr. 170.

On August 22, 1996, Callahan began seeing Dr. W.A. Magarino, whom she saw until December 16, 1997. Tr. 192–95, 204–08. On August 22, 1996, Dr. Magarino recorded that Callahan weighed 252 pounds. Tr. 193. At that time, her blood pressure was 140/80, *id.*, her body fat was 45.1%, Tr. 195, her body mass index was 41.6, *id.*, and she had a "very high" obesity risk index, *id.* Dr. Magarino observed that Callahan had hypertension, a clear chest, and a regular heart rhythm. Tr. 204. Dr. Magarino instructed her to exercise and reduce her food intake by half, and prescribed Adipex. Tr. 193. From that point until December 1997, Callahan's blood pressure remained constant, while her weight fluctuated between 240 and 255 pounds. Tr. 204–05. During this time, Dr. Magarino reported that Callahan was "doing fine." *Id.* On February 3, 1997, Dr. Magarino diagnosed Callahan with Carpal Tunnel Syndrome and prescribed Lodine and Bontril. Tr. 205. On December 16, 1997, Dr. Magarino reported that Callahan was "doing fine but [has] severe osteoarthritis," and prescribed Darvocet. *Id.*

On March 13, 1997, Callahan consulted Dr. Mark Freedman for constant pain that had lasted for one year in both arms from the palm to the elbow. Tr. 182. Dr. Freedman's neurological exam revealed that Callahan's manual dexterity was "grossly normal." Tr. 183. His ultimate impression was that Callahan suffered from bilateral hand pain and a history of hypertension. *Id.* Dr. Freedman referred Callahan to a vocational rehabilitation clinic for appropriate diagnosis and therapy so that she could return to work. *Id.*

### 2. Residual Functional Capacity

On March 30, 1997, Callahan had her first physical residual functional capacity assessment. The medical examiner diagnosed her with obesity and hypertension, as well as a history of hand pain. Tr. 184. The examiner found that she could occa-

sionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, push or pull with upper extremities to a limited nature and degree, and occasionally stoop and crouch. Tr. 185–87. The examiner found Callahan's complaints of hand pain and carpal tunnel syndrome to be credible, but found that the clinical evidence, along with her history of non-treatment, did not support Callahan's claims regarding the degree of her physical limitations. Tr. 189. The examiner therefore concluded that Callahan could be gainfully employed. *Id.*

On August 25, 1997, Callahan underwent a second residual functional capacity exam. Again she was diagnosed with hypertension and obesity. Tr. 196. The medical examiner came to the conclusion that despite Callahan's claims of hand pain and carpal tunnel syndrome, Callahan would recover her functional elements by December 1997, just over three months after the exam. Tr. 198, 201. The examiner's conclusion was based on findings that Callahan could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and walk for a total of six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, push or pull with upper extremities to a limited nature and degree, and occasionally balance, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds. Tr. 197–98.

### 3. Education and Past Relevant Employment

Callahan was born June 28, 1947. She was fifty years old at the time of her disability hearing. She graduated high school, completed one year of college, and attended vocational school for cosmetology

and word processing. Tr. 40–41. Callahan held several jobs from 1985 to 1996. She was an administrative assistant from 1985 to 1986, and a secretary from 1986 to 1987. Tr. 114. From 1993 to 1994, she was a teacher, stylist and the assistant director at a beauty school and salon. *Id.* She owned her own beauty salon from 1994 to 1995. *Id.* She continued working as a stylist in a beauty salon until April 1996. *Id.*

## B. Administrative Proceedings

Callahan first applied for disability insurance benefits on February 7, 1997. Tr. 84–86. The application was initially denied on April 14, 1997, Tr. 66–69, and again upon reconsideration on August 26, 1997, Tr. 72–75. Callahan requested a hearing before an administrative law judge, which took place on February 5, 1998. Tr. 37. On May 19, 1998, the administrative law judge issued written findings that Callahan's impairments alone and in combination did not meet or equal any of the listed impairments, Tr. 21, and that Callahan's testimony was not fully credible, especially as it pertained to her ability to do work at some level, Tr. 21–22. Callahan requested review by the Appeals Council, which was denied on April 19, 2000, Tr. 5, at which point the decision of the administrative law judge became the final decision of the Commissioner, *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir.1994), subject to review in this Court under 42 U.S.C. § 405(g). Importantly, however, the Appeals Council considered additional medical evidence submitted by Callahan, but still declined to review the decision of the administrative law judge. Tr. 5, 7. Callahan then filed a complaint in this Court on May 23, 2000.

## II. STANDARD OF REVIEW

The Court's review of a Social Security disability benefit determination is limited by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." *Id.*; *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir.1990). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420 (citation omitted); *accord Walden v. Schweiker*, 672 F.2d 835, 838–39 (11th Cir.1982). In *McRoberts v. Bowen*, 841 F.2d 1077 (11th Cir.1988), the Eleventh Circuit further delineated this standard, stating that substantial evidence "must do more than create a suspicion of the existence of the fact to be established," *id.* at 1080 (quoting *Walden*, 672 F.2d at 838).

This Court must therefore determine whether substantial evidence exists in the record as a whole to support the findings of the Commissioner. *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir.1983) (per curiam); *Walden*, 672 F.2d at 838. The Court has a duty to "scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir.1987) (per curiam). "It is incumbent upon the reviewing court to examine the findings and decision of the [Commissioner] in light of the record in its entirety, not only that evidence which supports the decision." *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir.1988).

"A determination that is supported by substantial evidence may be meaningless, however, if it is coupled with or derived from faulty legal principles." *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as recognized by Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1213–14 (11th

Cir.1991). Thus, the Court must also be satisfied that the Commissioner applied the correct legal standards in making her decision. *Boyd,* 704 F.2d at 1209; *Wiggins v. Schweiker,* 679 F.2d 1387, 1389 & n. 3 (11th Cir.1982). The Commissioner's determination of the proper legal standards to be applied is not entitled to a presumption of validity, *Bridges,* 815 F.2d at 624, and failure by the Commissioner to apply the correct legal standards is grounds for reversal, not remand, in most instances, *Wiggins,* 679 F.2d at 1389.

The scope of this Court's review is constrained by the Eleventh Circuit's instruction in *Martin:* The Court may not reweigh the evidence, try the case de novo, or substitute its own judgment for that of the Commissioner, even if it finds that the evidence preponderates against the Commissioner's decision. 894 F.2d at 1529.

The claimant, Callahan, bears the initial burden of establishing through credible evidence that she is disabled within the meaning of Social Security Act. *Gibson v. Heckler,* 762 F.2d 1516, 1518 (11th Cir. 1985) (per curiam). Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The statute further provides:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . .

*Id.* § 423(d)(2)(A).

Evidence of an impairment alone is therefore insufficient to justify an award of benefits. The claimant must also point to evidence in the record that demonstrates that the impairment prevents her from performing her past work activity. *Gibson,* 762 F.2d at 1518.

The Social Security Administration has promulgated regulations that break the determination of disability down into a five-step analysis. *See* 20 C.F.R. §§ 404.1520, 416.920. First, the Commissioner determines whether the claimant is currently employed. *Id.* Second, the Commissioner determines whether the claimant has an impairment that prevents the performance of basic work activities. *Id.* Third, the Commissioner determines whether the claimant's impairment meets or equals an impairment listed in Appendix 1 of Part 404 of the regulations. *Id.* Fourth, the Commissioner determines whether the claimant's impairment makes it impossible to meet the physical and mental demands of past work. *Id.* Finally, the Commissioner determines whether the claimant's age, education, and past work experience prevent the performance of any other work in the economy. *Id.* Under this sequential analysis, the Commissioner's duty ends as soon as she is capable of determining whether the claimant is disabled. *Id.*

In performing its review, this Court may not consider evidence that was not before the administrative law judge, even though the Appeals Council considered such evidence in its order denying Callahan further review. As the Eleventh Circuit stated in *Falge v. Apfel,* 150 F.3d 1320 (11th Cir.1998), "when the [Appeals Council] has denied review, we will look only to the evidence actually presented to

the [administrative law judge] in determining whether the [administrative law judge]'s decision is supported by substantial evidence." *Id.* at 1323. The basis for this rule is that "the correctness of [the] decision [of the administrative law judge] depends on the evidence that was before him," and thus that hearing officer "cannot be faulted for having failed to weigh evidence never presented to him." *Id.* In this case, it is clear that (1) the Appeals Council examined Callahan's new medical evidence, Tr. 5; (2) the Appeals Council nevertheless denied review, *id.;* and (3) Callahan does not appeal the Appeals Council's decision to deny review, but instead appeals only the decision of the administrative law judge to deny benefits, *see* Pl.'s Br. at 11–12. As such, this case falls squarely under the rule announced in *Falge,* and this Court must follow it in determining whether the decision of the administrative law judge is supported by substantial evidence.

## III. DISCUSSION

Callahan asserts that the finding of the administrative law judge that she is not disabled within the meaning of the Social Security Act is not supported by substantial evidence in the record as a whole. In particular, she claims the administrative law judge (1) improperly discredited her complaints of pain by failing to consider her impairments both individually and in combination, Pl.'s Br. at 7–8; (2) improperly evaluated her subjective complaints of pain and erred in finding her not to be a credible witness, *id.* at 8–9; (3) failed to pose a complete hypothetical question to the vocational expert, *id.* at 10–11; and (4) failed to develop the record fully by failing to obtain updated medical records and by disregarding evidence of side effects of Callahan's medication, *id.* at 11–12.

## A. Complaints of Pain from Individual and Combined Impairments.

■ Callahan is correct that an administrative law judge, in determining whether a claimant is disabled, must consider not only the disabling effects of each of the claimant's individual impairments, but also their combined effect. *Jones v. Dep't of Health & Human Servs.,* 941 F.2d 1529, 1533 (11th Cir.1991) (per curiam); *Wiggins v. Schweiker,* 679 F.2d 1387, 1392 (11th Cir.1982). In *Bowen v. Heckler,* 748 F.2d 629 (11th Cir.1984), the Eleventh Circuit stated "it is the duty of the administrative law judge to make specific and well-articulated findings as to the effect of the combination of impairments and to decide whether the combined impairments cause the claimant to be disabled." *Id.* at 635.

■ In the instant case, the record indicates that the administrative law judge fully satisfied this duty by evaluating Callahan's impairments, both individually and in combination. The administrative law judge, in compliance with the five-step sequential evaluation process outlined in 20 C.F.R. section 404.1520(a), considered Callahan's conditions at length and made specific and well-articulated findings as to the effect of the combinations of impairments. Tr. 21. At step two, the administrative law judge addressed Callahan's impairments as they appeared in her medical records, Tr. 20–21, and found them to be severe, Tr. 21. At step three of the process, the administrative law judge concluded:

No treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment. Particular attention was paid to the sections 1.00 (musculoskeletal system) and 9.09 (obesity) of the listings. *Even considering [Callahan's] impairments in combination,* they are not equivalent to a Listed Impairment in Appendix 1, Subpart P, Regulations No.

4. Accordingly, [Callahan's] impairments do not meet or equal a listed impairment.

Tr. 21 (emphasis added).

The Eleventh Circuit has approved of similar statements by administrative law judges in previous cases as adequate to discharge the Commissioner's duty to consider the combined effects of a claimant's impairments. *E.g., Jones,* 941 F.2d at 1533; *Wheeler v. Heckler,* 784 F.2d 1073, 1076 (11th Cir.1986) (per curiam).

The Court holds that the finding of the administrative law judge that Callahan is not disabled as a result of her impairments, individually and in combination, is supported by substantial evidence.

### B. Subjective Complaints of Pain and Witness Credibility

After considering all of the written evidence and Callahan's testimony at the February 5, 1998, hearing, the administrative law judge expressly found Callahan's subjective complaints of pain to be not entirely credible, especially as they pertained to her ability to do work at some level. Tr. 21–23. The judge then articulated several factors supporting his conclusion. Tr. 21–23.

■ The administrative law judge must consider Callahan's subjective testimony regarding her pain if there is "evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain." *Foote v. Chater,* 67 F.3d 1553, 1560 (11th Cir.1995) (per curiam). Once Callahan established through objective medical evidence that an underlying medical condition existed that could reasonably be expected to produce pain, the administrative law judge was required to consider evidence

about the intensity, persistence, and functionally limiting effects of pain in deciding the issue of disability. *Id.* at 1561; 20 C.F.R. §§ 404.1529, 416.929.

■ In making an evaluation of the claimant's subjective complaints about pain, the administrative law judge is required to articulate specific reasons for the finding on credibility, supported by the evidence in the record. Such reasons must be sufficiently specific to make clear to the claimant and to any subsequent reviewers the weight the judge gave to the claimant's statements and the reasons for that weight. *Foote,* 67 F.3d at 1561–62; 20 C.F.R. §§ 404.1529, 416.929.

■ In the instant case, the medical record includes evidence of an underlying medical condition that could reasonably be expected to produce pain. The administrative law judge recognized that Callahan "introduced medical evidence showing that she has an impairment reasonably expected to produce some pain," but found that "[n]either the objective medical evidence nor the testimony of [Callahan] establishes that the ability to function has been so severely impaired as to preclude all types of work activity." Tr. 23.

The administrative law judge supported his written conclusion about Callahan's degree of impairment and pain by examining all of Callahan's medical records from each of her doctors—Dr. Earp, Dr. Jones, Dr. Magarino, and Dr. Freedman. Tr. 20–22. The judge further supported his conclusion that Callahan lacked credibility regarding subjective complaints of pain by pointing to several discrepancies in her hearing testimony:

[Callahan] testified that her pain was so bad that it effected [sic] her ability to concentrate. She rated her pain as a 9 1/2 to 10 on a scale of 1 to 10, however, she takes only Tylenol over-the-counter medication to control the pain. Only recently has Ms. Callahan been pre-

scribed Darvocet which she avoids taking since she alleges an inability to function while using it. Additionally, [Callahan] testified that she can lift less than one pound without pain. Yet, [her] purse appeared to weigh more than five pounds. Finally, [Callahan] told Dr. Freedman at her consultative examination, that she stopped working due to pain in her hands for a year. This pain was allegedly diagnosed, without benefit of testing, by a family physician who told her that she had bilateral carpal tunnel syndrome.... [N]o splint, brace or medications were prescribed. Astonishingly, Ms. Callahan has not seen any other doctor for a second opinion, further evaluation, treatment or surgical resolution. Therefore ... [Callahan's] statements concerning her impairments and their impact on her ability to work are found not to be entirely credible.

Tr 21–22.

◼ "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote*, 67 F.3d at 1562. Here the administrative law judge articulated explicit reasons for his decision to discount Callahan's testimony regarding her pain, as is required by *Foote*. Nothing in the record conflicts with the assessment of Callahan's credibility by the administrative law judge. The administrative law judge appropriately performed its task of assessing witness credibility—a "task particularly suited to the fact finder," *Landry v. Heckler*, 782 F.2d 1551, 1554 (11th Cir. 1986) (per curiam)—in a manner that allowed for deferential yet meaningful review. This Court therefore declines to disturb the determination of the administrative law judge that Callahan's subjective complaints of pain were not wholly credible.

## C. Complete Hypothetical Question to Vocational Expert

Once the administrative law judge proceeds to step five of the five-step disability determination, the judge may utilize either the Medical–Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, app. 2, or the testimony of a vocational expert.[3] The goal at this stage is to determine whether the claimant may perform other work in the economy. If the answer is yes, then the claimant is not disabled within the meaning of the Social Security Act. 20 C.F.R. §§ 404.1520, 416.920. In this case, the administrative law judge utilized a vocational expert, and asked him

if there were jobs [Callahan] is able to perform given her particular residual functional capacity, which was stated as an individual capable of sedentary work with a 5 pound lift capability; a sit/stand option; occasional stooping, but no kneeling, squatting, or crawling; no repetitive pushing or pulling; no repetitive hand controls; no repetitive gross or fine manipulation or use of hands or arms; the ability to climb stairs or ramps, but not ropes, ladders or scaffolds; and no exposure to extreme hot or cold temperatures ... [taking] into account [Callahan's] age, educational background, and employment history.

Tr. 24–25.

◼ The administrative law judge included in his hypothetical to the vocational

---

3. There are certain instances where it is appropriate to use a vocational expert instead of the Medical–Vocational Guidelines to determine whether the claimant may perform other work in the national economy, and there are instances where the Medical–Vocational Guidelines suffice. *See generally Foote*, 67 F.3d at 1559 (outlining appropriate use of each method). Here, the administrative law judge utilized a vocational expert, and Callahan does not challenge that decision.

expert only those functional limitations he found to be credible in his residual functional capacity determination—omitting what he rejected as not credible. An administrative law judge is not required to inquire of the vocational expert regarding claimant's conditions found by the judge not to be credible. *See McSwain v. Bowen*, 814 F.2d 617, 619–20 & n. 1 (11th Cir.1987) (holding that an administrative law judge did not err in omitting from hypothetical questions to a vocational expert conditions that were either controlled by medication or not substantiated by the claimant); *Martinson v. Shalala*, 843 F.Supp. 1448, 1450–51 (M.D.Fla.1994) (approving hypothetical questions to a vocational expert that incorporated "objective medical testimony" of plaintiff's physicians but disregarded plaintiff's complaints of pain, which were found to be incredible). The Court holds that the hypothetical question posed by the administrative law judge to the vocational expert appropriately incorporated those of Callahan's impairments found to be credible, and only those impairments. The vocational expert's answer to the hypothetical question therefore satisfies the Commissioner's burden at step five of the disability determination process.

4. To be sure, Callahan could have requested that this Court remand to the Commissioner for further consideration of evidence discovered only after the decision of the administrative law judge denying disability benefits. 42 U.S.C. § 405(g). The Eleventh Circuit in *Falge* recognized this remedy as an exception to the general rule that the district court is limited to the evidence actually presented to the administrative law judge in determining whether the Commissioner's decision is supported by substantial evidence. 150 F.3d at 1323. Callahan has not requested such relief here, however, as she requests only reversal of the Commissioner's decisions and an award of benefits. Pl.'s Br. at 12–13.

## D. Fully Developing the Record

Callahan also asserts that the administrative law judge failed fully to develop the record by not obtaining the updated medical records from April 1998 to May 1999, which Callahan later submitted to the Appeals Council. The medical documents were not available at the time of the hearing, as the hearing took place on February 5, 1998, before these documents even existed. Callahan offers no support for her argument that an administrative law judge has an affirmative duty to obtain medical records that came into being only after the close of the disability hearing, and the Court is aware of no authority that supports her argument.

Instead, the burden was on Callahan to submit the post-hearing medical records to the Appeals Council in the form of a request for further review. Callahan satisfied this burden by submitting those records to the Appeals Council. When the Appeals Council considered the new evidence and denied further review, however, the record upon which this Court may draw in evaluating the final decision of the Commissioner became limited to the evidence originally submitted to the administrative law judge. *Falge*, 150 F.3d at 1322–1323.[4] That circumscribed record,

Had she made such a request, she would have had to show that "(1) new, noncumulative evidence exists, (2) the evidence is material such that a reasonable possibility exists that the new evidence would change the administrative result, and (3) good cause exists for the applicant's failure to submit the evidence at the appropriate administrative level." *Falge*, 150 F.3d at 1323. Although Callahan has failed even to argue that good cause exists for her failure to submit this evidence at the time of the hearing or before the decision of the administrative law judge issued, this Circuit appears to recognize the non-existence of evidence at the time of the hearing as good cause for its absence. *Mitchell v. Apfel*, No.

when viewed in its entirely, shows that the decision of the administrative law judge that Callahan is not disabled within the meaning of the Social Security Act is supported by substantial evidence.[5]

## IV. CONCLUSION

The decision of the administrative law judge is supported by substantial evidence in the record and the proper application of legal standards. It is therefore AFFIRMED.

---

Civ.A.98–W–1160–N, 1999 WL 33100499, at *2 (M.D.Ala. Sept.17, 1999) ("[U]nder Eleventh Circuit law, it appears that establishing 'good cause' requires no more than a showing that the evidence did not exist until after the conclusion of the administrative proceedings." (citing *Cannon v. Bowen,* 858 F.2d 1541, 1546 (11th Cir.1988); *Hyde v. Bowen,* 823 F.2d 456, 459 (11th Cir.1987); *Smith v. Bowen,* 792 F.2d 1547, 1550 (11th Cir.1986); and *Caulder v. Bowen,* 791 F.2d 872, 878 (11th Cir.1986))).

Callahan would also have had to demonstrate that the new evidence is material to her condition *for the period for which she was claiming benefits,* which she has also failed to do. Other circuits have suggested that evidence developed after the hearing is generally not material to the question whether the claimant was disabled for the period for which disability benefits were sought, but is instead material to the questions whether the claimant's condition has worsened since the time of the hearing, or whether the claimant has developed a new impairment that renders the claimant legally disabled. *Jones v. Callahan,* 122 F.3d 1148, 1154 (8th Cir.1997) ("An implicit requirement [of 42 U.S.C. § 405(g) ] is that the new evidence pertain to the time period for which benefits are sought, and that it not concern later-acquired disabilities or subsequent deterioration of a previously non-disabling condition."); *accord Sanchez v. Sec'y of Health & Human Servs.,* 812 F.2d 509, 511–12 (9th Cir.1987); *Johnson v. Heckler,* 767 F.2d 180, 183 (5th Cir.1985); *Szubak v. Sec'y of Health & Human Servs.,* 745 F.2d 831, 833 (3d Cir.1984).

Even though Callahan fails even to request, much less satisfy the elements of, remand pursuant to 42 U.S.C. § 405(g), she may not be completely barred from using this new evidence. As all of the above cases recognize,

evidence acquired after the decision of the administrative law judge issues may be introduced through a renewed application for disability benefits predicated upon deterioration of the claimant's condition since the time of the original hearing. *Jones,* 122 F.3d at 1154; *Sanchez,* 812 F.2d at 511–12; *Johnson,* 767 F.2d at 183; *Szubak,* 745 F.2d at 833. Should Callahan decide to pursue further relief, this is the proper method by which to do so.

5. Callahan also states in her brief that the administrative law judge failed fully to develop the record regarding the side effects of her medication. Pl.'s Br. at 11. Callahan did not raise the issue of side effects of medication at the hearing, however, and in the brief she submitted to this Court, she raises the argument only in a heading, without any further elaboration or factual support. Such a cursory treatment of a potentially important issue is taken by this Circuit to be a sign that the party has abandoned the argument. *See Rowe v. Schreiber,* 139 F.3d 1381, 1382 n. 1 (11th Cir.1998) (stating that failure to argue claims on appeal except in a single sentence in a brief means that the claims "have been abandoned and will not be considered"); *Cont'l Technical Servs., Inc. v. Rockwell Int'l Corp.,* 927 F.2d 1198, 1199 (11th Cir.1991) (per curiam) ("An argument not made is waived...."); *accord Harris v. Plastics Mfg. Co.,* 617 F.2d 438, 440 (5th Cir.1980) (per curiam) (holding that appellants' failure to pursue in the argument section of a brief an issue they raised in the questions presented section of the brief meant that appellants abandoned the argument). The Court therefore agrees with the Commissioner that Callahan has abandoned this argument, and it will not be considered further.